AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>(2) A black and gold iPhone<br>IMEI number 3533 3607 3489 222 | )<br>)<br>)<br>)<br>)<br>) | Case No. '22 MJ3441 |
|---|---|---|

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 846; | Distribution of Controlled Substances; Conspiracy |
| 18 USC 924(c) | Possession of firearm in connection with a drug trafficking offense |

The application is based on these facts:
See Attached Affidavit of DEA Special Agent Nicholas Priymak, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*
Nicholas Priymak, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: September 20, 2022

*Judge's signature*

City and state: San Diego, California          Hon. Mitchell D. Dembin, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Nicholas Priymak, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device(s):

    a. A black iPhone, Model A1660
       IMEI number 3549 1409 7662 385
       ("**Target Telephone #1**");

    b. A black and gold iPhone
       IMEI number 3533 3607 3489 222
       ("**Target Telephone #2**");

    (collectively the "**Target Telephones**")

as further described in Attachment A-1 (**Target Telephone #1**), A-2 (**Target Telephone #2**), and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Section 924(c), as further described in Attachment B. The **Target Telephones** were seized on October 12, 2020 in connection with the seizure of methamphetamine, a firearm and ammunition at the Highway 78 U.S. Border Patrol Checkpoint. The **Target Telephones** are currently in the custody of Drug Enforcement Administration located at 4560 Viewridge Avenue, San Diego, CA 92123.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Telephones**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I am a Special Agent with the Drug Enforcement Administration and have been so employed since July 2004. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), which is an officer

of the United States empowered by law to conduct investigation of and to make arrests for, offences enumerated in 18 U.S.C. § 2516. I am currently assigned to the San Diego Field Division ("SDFD"), Enforcement Group Five and have been so assigned since January 2019. During this time, I have investigated illicit controlled substance trafficking in San Diego and the surrounding areas. I have had formal training and experience in controlled substance investigations, and I am familiar with the manner in which controlled substances are manufactured, transported, packaged, marketed and consumed. I have also received training in the identification of a variety of types of controlled substances by sight and odor. I have made numerous arrests of violations involving such substances. In the course of my employment, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the manners and techniques of how controlled substances are being manufactured and transported locally.

4.  I have also completed sixteen (16) weeks of DEA Basic Agent training at the Justice Training Center in Quantico, Virginia. I am familiar with investigation of drug trafficking organizations, methods of importation and distribution of controlled substances and financial investigations. During the course of my employment, I have received comprehensive, formalized instruction, to include such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques. Throughout my law enforcement career, I have participated in over 50 investigations and made arrests for unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics, money laundering, and conspiracies associated with narcotics offenses. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not limited to, search warrants, surveillance, confidential source debriefing, and telephone toll data analysis in conducting Federal and California State wiretap investigations.

5.  Additionally, I am familiar with narcotics trafficker's methods of operation, including the manufacture, sales, distribution, storage, and transportation of federally

controlled substance such as heroin, methamphetamine, fentanyl, and cocaine. I am familiar with the collection of money proceeds from narcotics sales and trafficking, and methods of money laundering used to conceal the nature of the proceeds from such illicit activity. I have been involved in investigations regarding the unlawful possession and distribution of controlled substance, as well as related money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with money laundering and drug trafficking crimes, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846 and 18 U.S.C. §§ 371, 1956, 1957.

6. Except as otherwise noted, the information set forth in this affidavit has been provided to me by federal, state, and local narcotics task force officer(s) or other law enforcement officers. Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement to whom I have spoken or whose report I have read and reviewed. Likewise, information resulting from surveillance, except, where otherwise indicated, does not necessarily set forth my own observation, but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

7. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

//

3

//

    a.    tending to indicate efforts to distribute controlled substances and/or to possess or use firearms or ammunition in the furtherance of a drug trafficking event;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate efforts to distribute controlled substances and/or to possess or use firearms or ammunition in the furtherance of a drug trafficking event;

    c.    tending to identify co-conspirators, criminal associates, or others involved in efforts to distribute controlled substances and/or to possess or use firearms or ammunition in the furtherance of a drug trafficking event;

    d.    tending to identify travel to or presence at locations involved in the distribution of controlled substances and/or the storage of firearms and/or ammunition, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or person(s) with control over or access to, the target device; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

8. The Drug Enforcement Administration (DEA) is investigating activities of Daniel BRYANT after his encounter with US Border Patrol on October 13, 2020 at U.S. Highway 78 Border Patrol Checkpoint, which is in the Southern District of California. During the investigation, agents identified Daniel BRYANT as an individual believed to be involved in smuggling controlled substances from California to Arkansas for further distribution. BRYANT is also linked to the October 13, 2020 death of Kelsey GATEWOOD, with whom he was traveling.

9. On October 13, 2020, at approximately 7:00 p.m., a white 2014 Chevrolet Spark, Arkansas license plate number CZ-714-698, approached Border Patrol Agent (BPA)

4

Dean Gribbons and his K-9 in the pre-primary inspection area. During this encounter with the vehicle, BPA Gribbons received a positive alert from the K-9. During a conversation with BPA Gribbons, Kelsey GATEWOOD (driver) stated that she was returning to Arkansas after visiting her family in San Ysidro, CA and added that she was in California for one day.

10. The vehicle was then referred to the primary inspection area where BPA Gribbons informed the occupants of the vehicle that the K-9 had alerted to the vehicle. At that moment the rear passenger of the vehicle, Daniel BRYANT, stated that he had smoked marijuana and started moving his hands toward his waist out of BPA Gribbons' view. BPA Gribbons then ordered BRYANT to exit the vehicle. As BRYANT exited the vehicle, BPA Gribbons observed a syringe needle partially coming out of BRYANT'S pocket. The syringe containing suspected methamphetamine was subsequently removed from BRYANT'S pocket to prevent evidence destruction and injury to agents.

11. BPA agents then ordered the driver, GATEWOOD, and another rear seat passenger, Dalvin HALEY, to exit the vehicle. While exiting the vehicle, GATEWOOD told the agents that there was a firearm in the driver's side door pocket. All subjects exited the vehicle and were subsequently detained. HALEY and BRYANT were placed in holding cells, located inside the US Border Patrol Station, while GATEWOOD was placed in the rear seat of a marked BP vehicle.

12. The search of the vehicle revealed a loaded Taurus Judge .45/410 revolver (the "revolver") in the driver's side door pocket, a brown SAP (impact weapon) on the rear passenger seats, multiple knives, and approximately 490 grams of suspected methamphetamine inside an open USPS box located on the rear passenger seat. A presumptive field test of the substance revealed a positive result for the presence of methamphetamine.

13. During the search, agents also located and seized from the trunk of the vehicle six unspent rounds of ammunition, similar to the ammunition found in the revolver. The search of BRYANT'S personal belongings revealed a camouflage toiletry bag. Inside the

5

camouflage toiletry bag were two smaller bags, one bearing a label "CBD mins," the second containing 40 orange pills bearing the imprint "1|2" (per BRYANT – Clonazepam tablets) along with a small aluminum bindle filled with a crystalline substance resembling methamphetamine. A presumptive field test of the crystalline substance revealed a positive result for the presence of methamphetamine.

14. During the encounter with BPA Gribbons, GATEWOOD told BPA Gribbons she was pregnant and had swallowed an unknown amount of methamphetamine as the vehicle approached the checkpoint. GATEWOOD further added that BRYANT made her swallow the methamphetamine. BPA Gribbons immediately requested medical personnel to the checkpoint. Upon the medical personnel's arrival, the decision was made to transport GATEWOOD to the hospital. GATEWOOD was airlifted to a local hospital for further evaluation and treatment. Doctors X-rayed GATEWOOD'S stomach and found numerous plastic baggies inside her intestines and a cylindrical object with a pipe in her vaginal cavity. On October 17, 2020, GATEWOOD died of acute methamphetamine intoxication.

15. At the request of US Border Patrol, Imperial County Sheriff's Deputies responded to the US Border Patrol Checkpoint and took over the investigation at approximately 10:17 P.M.

16. BRYANT was advised of his *Miranda* rights and agreed to speak with detectives without the presence of an attorney. BRYANT admitted to the possession of methamphetamine found in the vehicle. He told the detectives that the methamphetamine was his and GATEWOOD's, but he denied knowledge of the methamphetamine found during the search of his personal belongings. BRYANT also admitted that he was a methamphetamine user, injected methamphetamine intravenously, and that the clear liquid inside the syringe seized from his pants pocket contained methamphetamine. BRYANT claimed ownership of the syringe.

17. BRYANT also told detectives that the revolver (Taurus Judge) was given to him by a friend in Arkansas for protection. BRYANT claimed ownership of both the revolver and SAP (impact weapon) found during the search of the vehicle.

18. The search of the vehicle and BRYANT's person resulted in the seizure of controlled substances, and other items specifically listed in a table below. The weights of controlled substances are approximates:

| No | Item Description | Units |
|---|---|---|
| 1 | Methamphetamine | 490 g |
| 2 | Methamphetamine | 5.7 g |
| 3 | Liquid Methamphetamine | 30 units |
| 4 | Clonazepam tablets | 40 d/u |
| 5 | Loaded Taurus Judge revolver | 1 piece |
| 6 | Ammunition | 11 rounds |
| 7 | SAP (Impact Weapon) | 1 piece |

19. Based on the types and quantities of drugs found in the vehicle and on BRYANT's person, GATEWOOD's statements just before her death, and my training and experience, I believe that BRYANT had acquired methamphetamine for the purpose of transporting it to Arkansas for further distribution. I also believe that BRYANT intended to ship the methamphetamine found in the vehicle inside the USPS postal box to Arkansas.

20. The **Target Telephones** were located and seized from the passenger area of the vehicle. The were initially seized by the Imperial County Sheriff's Office, but were later turned over the DEA for further investigation. Based on the location of the phones, I believe **Target Telephone #1** likely belongs to BRYANT and that **Target Telephone #2** belonged to GATEWOOD.

21. Moreover, neither BRYANT nor HALEY claimed ownership of **Target Telephone #2**. I therefore suspect that **Target Telephone #2** was used by GATEWOOD, the decedent. Because **Target Telephone #2** was located in the passenger area of the vehicle, and because criminal targets may seek to distance themselves from evidence, such as a cellphone that contains inculpatory evidence, I am nevertheless seeking a search warrant for **Target Telephone #2** in the excess of caution and in the event it does actually belong to BRYANT and/or HALEY, rather than the decedent, GATEWOOD.

22. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts

and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of **Target Telephones**. In light of the above facts and my experience and training, I believe there is probable cause to believe that BRYANT and GATEWOOD were using the **Target Telephones** to communicate with others to further the distribution of illicit narcotics in the United States and to possess firearms/ammunition in furtherance of their drug trafficking activities.

23. I also request to search the Target Telephones without any date limitation for several reasons. First, a critical component of this investigation the identification of the true user of the **Target Telephones**. Information identifying the user of a cellphone is relevant regardless of the date of that data. For example, records on a cellphone demonstrating prolonged use of a cellphone by a particular individual tends to indicate that individual is the user of the device. This information is relevant irrespective of the date range of the data.

24. In addition, based on my training and experience and consultation with law enforcement officials familiar with the forensic extraction of cellphones, I know dates and times associated with certain files will often be well outside normal time limitations. For example, cellphones can contain files that are date-stamped January 1, 1970. This date predates the existence of cellphones. Based on open source research, I learned that January 1, 1970 00:00:00 is known as the Unix epoch time. Unix epoch time is a way of representing a timestamp by representing the time as the number of seconds since January 1, 1970 at 00:00:00 UTC. One of the primary benefits of using Unix epoch time is that it can be represented as an integer, which makes it easier to parse and use across different systems. Sometimes when metadata on a file is erased, the timestamp is zeroed out and thus will default January 1, 1970. If a search warrant limited is to a period, such the 6 months before an arrest, then files that may have been deleted, or whose metadata may have been programmatically (or manually) removed, may display the Unix epoch time as their timestamp. These dates would fall outside the warrant range.

25. Further, depending on the type of cellular phone, a phone can contain a log indicating the first time the user of the phone added and/or communicated with one of user's contacts. This information is relevant regardless of any time limitation because it can help establish the length of time two targets have been in contact or when they first became in contact.

26. Modern cellphones also often store financial information such as methods of payment. Many iPhone models, for example, such as the **Target Telephones**, have a digital wallet that allows users to store credit cards and other payment methods. Payment methods may have date stamps associated to when they were added to a phone. By placing a time limitation, that information could get excluded from the forensic examination.

27. Likewise, increasingly I have seen users of cellular phones use app-based messaging services, such as WhatsApp, to communicate with one another. These messaging apps often have built-in emojis and other images that users can use to communicate to one another. In other words, these images can give context to communications. For example, a user may send a message asking for "10 units" of something. Another user may simply respond with a thumbs-up emoji. In context, the thumbs-up image provides additional meaning to the conversation. Built-in images and icons, however, often have a date/time stamp that matches the *installation* date of a particular app, rather than its usage in a conversation. In a date-limited search, images and icons like the thumbs-up icon described above could be excluded from the search if the application associated with that image was installed outside the given date range, which naturally could remove crucial context from other pertinent communications.

28. In similar vein, in many instances when attachments, such as images or documents, are sent using messaging services, the attachments will retain the original date/time stamp of the file being sent. So for example, if an individual sends a photo from the internet that has a date stamp, that date stamp can carry over to the file saved on the cellphone. Once more, a date-limited search may exclude such information from the data.

29. Similarly, the search warrant being requested would allow agents to seize data

9

"tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved" in the crimes being investigated. In many instances, individuals involved in drug trafficking or other criminal activity use coded language. By being able to look at a broader range of communications, rather than a narrow snapshot, I can make a more accurate assessment as to coded and veiled language used by the targets of this investigation. Once more, a date-limited search will artificially narrow that understanding by providing a more limited data set to evaluate coded language.

30. For all of the foregoing reasons, I believe agents should be allowed to search the **Target Telephones** without any specified date range.

## METHODOLOGY

31. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such

1  acquisition, the examiner must inspect the device manually and record the process and the
2  results using digital photography. This process is time and labor intensive and may take
3  weeks or longer.

4  32.  Following the issuance of this warrant, I will collect the **Target Telephones**
5  and subject them to analysis. All forensic analysis of the data contained within the
6  telephone and its memory cards will employ search protocols directed exclusively to the
7  identification and extraction of data within the scope of this warrant.

8  33.  Based on the foregoing, identifying and extracting data subject to seizure
9  pursuant to this warrant may require a range of data analysis techniques, including manual
10 review, and, consequently, may take weeks or months. The personnel conducting the
11 identification and extraction of data will complete the analysis within ninety (90) days of
12 the date the warrant is signed, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

14 34.  Law enforcement has not previously attempted to obtain the evidence sought
15 by this warrant.

16 //
17 //
18 //
19 //
20 //
21 //
22 //
23 //
24 //
25 //
26 //
27 //
28 //

11

## CONCLUSION

35. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Telephones** will yield evidence of violations of Title 21, United States Code, Sections 841 and 846 and Title 18, United States Code, Section 924(c). Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachments A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Nicholas Priymak
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on September 20, 2022.

_____
Honorable Mitchell D. Dembin
United States Magistrate Judge

12

## **ATTACHMENT A-2**

PROPERTY TO BE SEARCHED

The following property is to be searched:

    (2)    One black and gold iPhone
IMEI 3533 3607 3489 222
("**Target Telephone #2**").

**Target Telephone #2** is currently in the possession of Drug Enforcement Administration located at 4560 Viewridge Avenue, San Diego, CA 92123.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachments A-1 and A-2, includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data stored on the cellular phone

a. tending to indicate efforts to distribute controlled substances and/or to possess or use firearms or ammunition in the furtherance of a drug trafficking event;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate efforts to distribute controlled substances and/or to possess or use firearms or ammunition in the furtherance of a drug trafficking event;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to distribute controlled substances and/or to possess or use firearms or ammunition in the furtherance of a drug trafficking event;

d. tending to identify travel to or presence at locations involved in the distribution of controlled substances and/or the storage of firearms and/or ammunition, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or person(s) with control over or access to, the target device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 21, United States Code, Sections 841, 846 and Title 18, United States Code, Section 924(c).**